# Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement

The Government Corporation Control Act does not require the National Aeronautics and Space Administration to obtain legislative authorization before entering into a "gain sharing benefit" agreement with a private corporation that grants NASA deferred cash payments based on an increase in the value of the corporation's common stock.

September 18, 2000

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION
AND
THE GENERAL COUNSEL
OFFICE OF MANAGEMENT AND BUDGET

This memorandum resolves a dispute between the National Aeronautics and Space Administration ("NASA") and the Office of Management and Budget ("OMB") regarding whether the proposed terms of an agreement between NASA and a private corporation would violate the Government Corporation Control Act ("GCCA"). Specifically, we have been asked whether 31 U.S.C. § 9102 (1994) requires NASA to obtain legislative authorization before entering into a "gain sharing benefit" agreement with a private corporation that grants NASA deferred cash payments based on an increase in the value of the corporation's common stock. For the reasons explained below, we conclude that section 9102 of title 31 does not require NASA to obtain legislative authorization in order to enter into the proposed agreement.

## I. Background

In October 1999, Congress established a Space Station Commercial Development Demonstration Program giving NASA authority "to establish a demonstration regarding the commercial feasibility and economic viability of private sector business operations involving the International Space Station." Pub. L. No. 106–74, § 434, 113 Stat. 1047, 1097 (1999). As part of this program, NASA issued a public request for "entrepreneurial offers" in December 1999 seeking private sector interest in development of multi-media products and services related to the development of the International Space Station ("ISS") and the exploration of space. NASA received many responsive offers and selected Dreamtime Holdings, Inc. ("Dreamtime") to enter negotiations for a collaborative agreement. Dreamtime is a privately held Delaware corporation. NASA informs us that Dreamtime was not formed by NASA, is not owned by any individuals directly or indirectly associated with NASA, and was created without any support from

212

NASA. As part of the collaborative agreement, Dreamtime is required to negotiate agreements with four independent companies that will likely receive substantial equity positions in the corporation.

Under the proposed agreement, NASA and Dreamtime will each make contributions as part of a collaborative commercial enterprise involving the ISS, pursuant to Pub. L. No. 106–74. *See* Agreement for Collaboration on Multi-Media Activities between the National Aeronautics and Space Administration and Dreamtime Holdings, Inc. (May 17, 2000) (the "Agreement"). This legislation not only authorizes the creation of a commercial demonstration program but also permits NASA to collect and retain receipts from the commercial use of the ISS. The legislative history indicates the law was intended to permit NASA to negotiate market-based levels of payment for relevant goods and services. *See* H.R. Conf. Rep. No. 106–379, at 153 (1999) ("In order to encourage private investment and increase economic activity in low earth orbit, NASA may negotiate for payments, at a value set by the private market, and retain any funds received in excess of costs for re-investment in the station economic development program."). Pursuant to the agreement, the parties will share use of high definition television equipment provided by Dreamtime, and NASA will provide access to and accommodations for Dreamtime's television equipment and services on the Space Shuttle, on the ISS, and at various NASA locations. Dreamtime will use the equipment and access to produce images for its commercial distribution, with special emphasis on the Internet. NASA will receive rights to use the images for agency purposes, including public affairs, scientific and engineering needs, research and development, and various missions and operations. In addition, the parties agree to collaborate on the development of educational products and documentary programming, with the goal of increasing public awareness of the ISS and its related programs. To assist in the development of these products and programs, NASA will make its still, film, and video archives available to Dreamtime for digitization and enhancement. The proposed agreement has a seven-year term with an option for a five-year extension. NASA informs us that, according to current estimates, its contributions to the endeavor would be worth approximately $38 million, and Dreamtime's contribution would be $100 million over the term of the agreement.

Dreamtime has offered to provide a gain-sharing benefit ("GSB") to NASA as financial remuneration. Article II of the Agreement sets forth the terms of the GSB arrangement, which permits NASA to receive a monetary benefit from the success of the endeavor. In exchange for its collaboration, NASA would receive a contractual right to cash payments based on the appreciation of Dreamtime's stock. The GSB tracks the fluctuation in value of an amount of stock equal to twenty-five percent of the initial capitalization of the corporation with some subsequent adjustments, and the right to payment vests at a rate of twenty-five percent per year for four years with certain time restrictions. The GSB is not transferable by NASA, except that it may be transferred to an ISS-related non-governmental

organization, if such an organization is ultimately established. *See* Agreement, art. II; Letter for Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Edward A. Frankle, General Counsel, National Aeronautics and Space Administration (May 12, 2000) ("NASA Letter #1"), encl. 2.

OMB takes the position that the proposed GSB provision would run afoul of the GCCA because NASA would be "establish[ing] or acquir[ing]" a corporation to "act as an agency" without specific authorization by law. Letter for Daniel Koffsky, Acting Deputy Assistant Attorney General, Office of Legal Counsel, from Robert G. Damus, General Counsel, Office of Management and Budget at 1 (May 26, 2000) ("OMB Letter"). NASA disagrees, arguing that the agency played no role in the establishment of Dreamtime and that the payment of a GSB cash award based on Dreamtime's stock performance does not amount to acquisition of the corporation. *See* NASA Letter #1; Letter for Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Edward A. Frankle, General Counsel, National Aeronautics and Space Administration (June 8, 2000) ("NASA Letter #2"). Furthermore, NASA argues that Dreamtime is a private company engaged in a collaborative commercial endeavor and does not "act as an agency" within the meaning of the GCCA. NASA Letter #1, at 4. Our Office has been asked to resolve this dispute.

## II. Discussion

The dispute between OMB and NASA centers on section 304(a) of the GCCA, codified at 31 U.S.C. § 9102 (1994). Section 9102 of title 31 provides that "[a]n agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action." We conclude that, under the proposed GSB agreement, NASA would not "establish or acquire" Dreamtime and Dreamtime would not "act as an agency" within the meaning of 31 U.S.C. § 9102.[1] Accordingly, authorizing legislation for the agreement is not required under the GCCA. We offer no view on the policy implications of the proposed financial arrangement between NASA and Dreamtime.

---

[1] In the last ten years, we have provided a detailed analysis of GCCA issues on two occasions The more recent of these was a request for advice from the National Endowment for the Arts ("NEA") concerning whether the NEA could create a separate nonprofit organization as a fundraising auxiliary to the agency. Letter for Karen Christensen, General Counsel, National Endowment for the Arts, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel (Oct. 30, 1995). The earlier opinion concerned the creation of a corporation by employees of the Small Business Administration ("SBA") to liquidate the assets of a failed SBA investment company Memorandum for Susan S. Engeleiter, Administrator, Small Business Administration, from J. Michael Luttig, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Government Corporation Control Act* (June 6, 1990) These two opinions provide the framework for our analysis of the present question

A.

First, we consider whether NASA's proposed GSB arrangement with Dreamtime would constitute the establishment or acquisition of a corporation. OMB argues that the GSB provision amounts to an *acquisition* of the company under the GCCA because the GSB is designed to track the value of twenty-five percent of the initial capitalization of the company. According to OMB, the GSB is "a right substantially equivalent in all material respects to ownership of non-voting common stock" and should be treated as stock ownership. OMB Letter at 2. In addition, OMB contends that NASA *established* Dreamtime within the meaning of section 9102 because "it is not clear that the corporation would or could exist in the form contemplated absent the agreement with NASA, nor is it clear that the resulting entity would have any reality as an ongoing enterprise without NASA." *Id.* at 3.

We believe that, under the contemplated agreement, NASA would neither acquire nor establish the corporation. In our opinion for the National Endowment for the Arts ("NEA"), although we ultimately concluded that the NEA could not create a nonprofit organization to serve as a fundraising auxiliary to the agency without specific congressional authorization, we repeated our prior advice that "an agency probably cannot be said, within the meaning of the statute, to have established or acquired a corporation to act as an agency unless the government holds an ownership interest or exercises legal control." Letter for Karen Christensen, General Counsel, National Endowment for the Arts, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel at 1 (Oct. 30, 1995) ("NEA Opinion"). We also warned that the ambiguity in the term "establish" suggested that — even where there is no such ownership or control — an agency should avoid excessive government involvement in the formation or operation of a corporation in the absence of a law authorizing the agency to do so. *Id.* We noted that

> the Endowment must maintain a distance between itself and any outside organization that may be created to raise funds. Not only must the Endowment not own or control the corporation, but the corporation must be free to adopt and change its charter and by-laws to the same extent as any other non-government corporation. Furthermore, no officials of the Endowment should serve on the board of the non-profit corporation.

*Id.* at 2. We acknowledged that the Endowment could have some involvement with the corporation without running afoul of the GCCA. For instance, it could encourage private parties to form a corporation, and it could make suggestions about the substance of the corporate charter or by-laws. We further concluded

that "[t]he Endowment could also take part in joint activities with the corporation," so long as the NEA officials "act at all times in the interests of the United States, rather than the corporation." *Id.* at 3.

We continue to believe, as we noted in our NEA Opinion, that an agency cannot be said to *acquire* a corporation unless it "holds an ownership interest or exercises legal control." NASA does not hold such an interest or exercise such control with respect to Dreamtime. It merely holds a contractual right to cash payments that are determined by reference to the value of the corporation's stock. NASA does not own stock or any other equity interest and, to our knowledge, has no representative on the corporation's Board of Directors. Even if the economic or market value of NASA's contractual right is substantially equivalent to the value of non-voting stock, NASA is not a Dreamtime stockholder and cannot be said to have ownership or control in the company.

Furthermore, we do not believe that NASA can be said to have *established, created,* or *organized* Dreamtime within the meaning of the GCCA.[2] As we noted in the NEA Opinion, the relevant question is whether NASA has excessive involvement in the formation or operation of the corporation, even in the absence of legal ownership or control.[3] We have been informed that Dreamtime was created by private investors who have no direct or indirect association with NASA and that Dreamtime was formed without any support or encouragement from NASA. Dreamtime adopted its by-laws and charter without any input from NASA, and remains free to make its own business decisions and to change its by-laws and charter as appropriate without interference or approval by NASA. Neither NASA's collaboration with Dreamtime since the latter's creation nor the fact that Dreamtime's ultimate success is dependent upon that collaboration is evidence of any government involvement in the company's formation or operation. Indeed, we specifically noted in our NEA Opinion that agencies remain free under the GCCA to participate in joint activities with private corporations, so long as the agency acts exclusively in the interest of the United States.

We do not find support for OMB's position on these questions in the legislative history of the GCCA, which reveals that the law's intent was to stop agencies

---

[2] As originally enacted, section 304(a) of the Act stated that "[n]o corporation shall be created, organized, or acquired hereafter by any officer or agency of the Federal Government or by any Government corporation for the purpose of acting as an agency or instrumentality of the United States," except as specifically authorized by statute. GCCA, Pub L. No. 79-248, ch 557, 59 Stat. 597, 602 (1945) When section 304(a) was recodified in 1982, the phrase "created, organized, or acquired" was changed to "establish or acquire," but Congress stated that the changes should not be interpreted as substantive. Pub. L. No. 97-258, § 4(a), 96 Stat 877, 1067 (1982).

[3] A recent Comptroller General opinion echoes this understanding of the phrase "establish or acquire" in the GCCA In a 1998 opinion, the Comptroller General held that the Federal Communication Commission's role in forming two nonprofit corporations to administer certain functions of its universal service programs violated the GCCA "In our view, the Control Act prohibits an agency from creating or *causing creation* of a corporation to carry out government programs without explicit statutory authorization" Matter of the Honorable Ted Stevens, B-278,820, 1998 WL 465124, at *4 (C.G. Feb. 10, 1998) (Emphasis added.). The opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues. However, they are not binding upon departments, agencies, or officers of the Executive Branch *See Bowsher v. Synar,* 478 U.S. 714, 727–32 (1986)

from creating instrumentalities of the United States Government under state or local law and to bring corporate agencies performing government functions under congressional oversight and control. The GCCA was the product of a lengthy congressional inquiry into agency practice of creating private corporations to conduct government business. In August 1944, the Joint Committee on the Reduction of Nonessential Federal Expenditures released a comprehensive report about such corporations. S. Doc. No. 78–227 (1944) ("Joint Committee Report"). The Joint Committee Report recommended a variety of legislative measures, and in 1945 Congress acted on those recommendations to pass the GCCA, Pub. L. No. 79–248, ch. 557, 59 Stat. 597 (1945). Most of the Act's provisions were designed to regulate or facilitate congressional oversight of the financial transactions of certain enumerated "wholly owned" and "mixed-ownership" government corporations, but section 304 concerned the creation of corporations to act as government agencies.

The Senate Committee report accompanying the bill stated:

> It does not seem desirable to continue any longer this anomalous situation in which an instrumentality of the Federal Government is technically a creature of a State or local government. Moreover, some of these corporations were chartered without specific authority of Congress. The bill provides that no wholly owned Government corporation created by or under the laws of any State, Territory, or possession of the United States or any political subdivision thereof, or under the laws of the District of Columbia, shall continue as an agency or instrumentality of the United States after June 30, 1948 . . . . It further provides that no corporation shall be created, organized, or acquired hereafter by any officer or agency of the Federal Government or by any Government corporation for the purpose of acting as an agency or instrumentality of the United States, except by act of Congress or pursuant to an act of Congress specifically authorizing such action.

S. Rep. No. 79–694, at 13–14 (1945); *accord* H.R. Rep. No. 79–856, at 11 (1945). In passing this legislation, Congress was focused on agencies that formed private corporations to perform government functions, thus removing those functions from effective congressional oversight. Neither the language of the statute nor the legislative history supports the theory that Congress was concerned with financial agreements between government agencies and the private corporations with which they do business that involve no government formation, ownership, or control of the private corporation.

Indeed, it is worth noting that the legislative history of the statute authorizing NASA to carry out this very program — the International Space Station Commer-

cial Development Demonstration Program — suggests that Congress sought to encourage collaborative commercial ventures in which NASA's compensation was set by reference to market value. The House Conference Report stated that "the conferees have included bill language establishing a demonstration program intended to test the feasibility of commercial ventures using the station, and whether or not it is possible to operate the station in accordance with business practices. In order to encourage private investment and increase economic activity in low earth orbit, NASA may negotiate for payments, at a value set by the private market, and retain any funds received in excess of costs for re-investment in the station economic development program." H.R. Conf. Rep. No. 106–379, at 152–53 (1999). The GSB provision is a market-based payment agreement. While the GSB arrangement may be novel, and perhaps has some risk associated with it, Congress apparently contemplated the economic implications of setting payments at a value dictated by the private market before authorizing the program. For the reasons discussed above, we conclude that NASA's proposed GSB agreement with Dreamtime does not constitute the establishment or acquisition of a corporation within the meaning of 31 U.S.C. § 9102.

### B.

Even if there were some doubt as to whether the proposed GSB provision *did* constitute the acquisition or establishment of Dreamtime for purposes of the Act, congressional authorization would only be required if NASA established or acquired Dreamtime *to act as an agency*. Based on our understanding of the proposed arrangement between NASA and Dreamtime, we do not believe that Dreamtime would act as an agency within the meaning of 31 U.S.C. § 9102.

In a 1990 opinion, we considered whether the Small Business Administration's ("SBA") creation of a corporation under Delaware law to liquidate the assets of a failed Small Business Investment Company licensed by the SBA after it was appointed to serve as a receiver constituted the establishment of a corporation *to act as an agency*. Memorandum for Susan S. Engeleiter, Administrator, Small Business Administration, from J. Michael Luttig, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Government Corporation Control Act* (June 6, 1990) ("SBA Opinion"). An "agency" is defined as "a department, agency, or instrumentality of the United States Government." 31 U.S.C. § 101 (1994). Referring to this definition, we concluded that the corporation formed by the SBA acted as an instrumentality of the government under the GCCA. Our analysis first considered the commonly understood meaning of the term instrumentality and the legislative history of section 304:

> In common usage, an instrumentality is a thing through which a
> person or entity acts. The term implies both [1] that the thing is

218

> controlled by another actor and [2] that the thing is or may be delib-
> erately used to accomplish the actor's objectives. This common
> sense definition is supported by section 304(b) of the Act and its
> legislative history. As noted previously, section 304(b) required any
> wholly owned government corporation chartered under state or
> local law to discontinue service "as an agency or instrumentality
> of the United States" and to liquidate after June 30, 1948, unless
> reincorporated by Congress. That section was aimed at 18 specific
> corporations chartered under state or local law that had been identi-
> fied by the [Joint Commission Report]. . . . The language of sec-
> tion 304(b) shows, and the legislative history confirms, that Con-
> gress viewed these 18 corporations as instrumentalities of the fed-
> eral government. . . . Consistent with the commonly accepted
> meaning of "instrumentality," each of these corporations was
> wholly owned by the United States, and thus subject to its control,
> and each was established or acquired to perform one or more tasks
> on the government's behalf or for its benefit.

SBA Opinion at 8–9 (numbers added). Second, we examined the use of the term "instrumentality" in other legal contexts and developed a list of four factors to consider in deciding whether a corporation is a government instrumentality: (1) whether the entity was created by the government; (2) the extent of government control over its operations; (3) the source of the entity's funding; and (4) the purposes for which it was created and the functions it performs.[4] *Id.* at 11–13.

Subsequent federal case law, as well as an opinion by the Comptroller General, supports this analytical framework, and indeed, appears to recognize somewhat greater flexibility than we have endorsed. In *Varicon International v. OPM*, 934 F. Supp. 440 (D.D.C. 1996), the district court considered whether the Office of Personnel Management violated the GCCA when it created a private company, the United States Investigations Service ("USIS"), to perform background inves-tigations previously completed by the agency. Relying on *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374 (1995), in which the Supreme Court considered whether the National Railroad Passenger Corporation was an agency or instrumen-tality of the government for purposes of individual rights guaranteed by the Con-stitution, the district court applied a similar multi-factor test to conclude that USIS did not act as an agency under 31 U.S.C. § 9102:

> The record currently before the court indicates that USIS is a pri-
> vate company owned by its employees . . . ; none of the USIS

---

[4] We also noted that the factors would vary in importance depending upon the particular statute or doctrine being applied. "Since the purpose of the Government Corporation Control Act was to assert greater federal dominion over the financial affairs of entities controlling federal funds, the source of the entity's funding is more important here than it might be in other contexts." SBA Opinion at 12

> employees will be employed in any manner or in any capacity by
> the government; the government will have no control over the USIS
> board of directors, management, or employees, except as provided
> for in the contract; the government will not own or have any rights
> or obligations to own any USIS stock; the government will have
> no right or ability to appoint members of the USIS board of direc-
> tors; and, the government has no obligation to or intention to make
> payments to or otherwise financially assist USIS except as provided
> under the contract in payment for service performed under the con-
> tract. . . . [I]t is the court's conclusion that USIS appears to be
> a private corporation which was awarded a government contract,
> and not a corporation which is acting as a federal agency.

934 F. Supp. at 447. Furthermore, in a 1992 opinion concerning the applicability
of the GCCA to the creation of Federally Funded Research and Development Cen-
ters, the Comptroller General applied similar criteria, observing that " 'agents or
instrumentalities of the United States' are component parts of the federal govern-
ment which are vested, by law, with the authority to act on behalf of the United
States, or to fulfill some statutory mission of the federal government." Matter
of the Honorable David Pryor, 71 Comp. Gen. 155, 158 (1992).

The factual context of the creation and operation of Dreamtime, when measured
against the commonly understood meaning of the term "instrumentality" and the
four-part test set forth in our SBA Opinion, leads to the conclusion that Dreamtime
was not established or acquired to act as an agency under 31 U.S.C. § 9102. First,
as we discussed above, Dreamtime was created by private individuals who are
not associated with NASA. While it is true that Dreamtime was formed in
response to NASA's published notice of its intent to enter collaborative ISS
commercial agreements with private business partners, the corporation was created
without the support or encouragement of the agency. Second, NASA owns no
part of Dreamtime and exercises no control over its operations. Dreamtime is
owned by private shareholders and, as we understand it, no government employees
serve on the company's Board of Directors. NASA Letter #1, at 4. Third,
Dreamtime is funded by private sources, not funds drawn from the federal
Treasury or other federal assets. See Agreement, art. IV ("NASA will not provide
any appropriated funds to Dreamtime under this Agreement.").

The final factor — the purposes for which Dreamtime was created and the func-
tions it performs — is the most complicated to apply here. Our SBA Opinion stated
that the corporation created by the SBA amounted to a government instrumentality
because it "was created to benefit SBA and to assist the agency in accomplishing
its goals. No private entities profit from [the corporation's] operations except per-
haps indirectly, as paid contractors of the corporation." SBA Opinion at 13. At
first blush, Dreamtime seems to be similarly situated because the corporation was

created specifically in response to statutory authorization for the Space Station Commercial Development Demonstration Program, and the access to high definition television that Dreamtime provides will, in fact, assist NASA in accomplishing its statutory mission of space exploration. However, Dreamtime was not formed for NASA's exclusive benefit, nor to carry out any statutory function delegated to the agency by Congress. While the collaborative agreement is designed to benefit both Dreamtime and NASA, Dreamtime has its own stake in the arrangement — the production of high definition television images for its commercial use on the Internet and elsewhere. This is entirely separate from NASA's purpose in entering the agreement, which includes the right to use the images for NASA public affairs, scientific and engineering concerns, research and development, and missions and operations. Since Dreamtime is not owned, controlled, or funded by NASA or any other government agency, and it does not perform any statutory functions assigned to NASA, we conclude that the corporation was not established to act as an instrumentality of the United States government.[5]

## III. Conclusion

The GCCA does not require NASA to obtain legislative authorization to enter an agreement to receive a GSB in the form of cash payments based on the value of a percentage of Dreamtime's stock. The GSB does not constitute stock ownership, and it does not give NASA any control over the corporation. Furthermore, NASA cannot be said to have established Dreamtime within the meaning of 31 U.S.C. § 9102. Even if the GSB agreement were found to constitute establishment or acquisition of Dreamtime by NASA, the GCCA would not be implicated because Dreamtime could not be said to "act as an agency" under the GCCA.

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*

---

[5] This conclusion is further supported by article XIII of the Agreement, which states that "[a]lthough this Agreement reflects a decision on the part of the Parties to enter into a multi-media collaboration, the Parties are independent of each other, and nothing herein will be deemed to create any legal partnership, joint venture, or association between the Parties."